FILED
CLERK, U.S. DISTRICT COURT

FEB  9 2009

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

DAVID PINEDA OLIVA,                 )    NO. CV 08-3772-ODW(E)
                                    )
            Petitioner,             )
                                    )    ORDER ADOPTING FINDINGS,
      v.                            )
                                    )    CONCLUSIONS AND RECOMMENDATIONS
ANTHONY HEDGPETH,                   )
                                    )    OF UNITED STATES MAGISTRATE JUDGE
                                    )
            Respondent.             )
_____     )

      Pursuant to 28 U.S.C. § 636, the Court has reviewed the Petition,
all of the records herein and the attached Report and Recommendation
of United States Magistrate Judge.  The Court approves and adopts the
Magistrate Judge's Report and Recommendation.


      IT IS ORDERED that the Petition is conditionally granted.
Respondent shall discharge Petitioner from all adverse consequences of
the judgment in Superior Court action No. BA248106, unless Petitioner
is brought to retrial within ninety (90) days of the entry of Judgment
herein, plus any additional delay authorized under State law.
///

1     IT IS FURTHER ORDERED that the Clerk serve copies of this Order,

2 the Magistrate Judge's Report and Recommendation and the Judgment

3 herein by United States mail on Petitioner, counsel for Petitioner,

4 and counsel for Respondent.

5

6     LET JUDGMENT BE ENTERED ACCORDINGLY.

7

8     DATED:       _02-09-2009_ .

9

10

11     _____

            OTIS D. WRIGHT, II

12       UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DAVID PINEDA OLIVA,                    ) NO. CV 08-3772-ODW(E)
                                       )
                Petitioner,            )
                                       )
        v.                             ) REPORT AND RECOMMENDATION OF
                                       )
ANTHONY HEDGPETH,                      ) UNITED STATES MAGISTRATE JUDGE
                                       )
                Respondent.            )
_____)

        This Report and Recommendation is submitted to the Honorable Otis
D. Wright, II, United States District Judge, pursuant to 28 U.S.C.
section 636 and General Order 05-07 of the United States District
Court for the Central District of California.

                            PROCEEDINGS

        Petitioner filed a "Petition for Writ of Habeas Corpus By a
Person in State Custody" on June 9, 2008, accompanied by a Memorandum
of Points and Authorities ("Pet. Mem."). Respondent filed an Answer
on September 2, 2008. Petitioner filed a Reply on October 13, 2008.

**BACKGROUND**

A jury found Petitioner guilty of the first degree murder of Jeovanni Acosta[1] in violation of California Penal Code section 187(a) (Reporter's Transcript ["R.T."] 858-59; Clerk's Transcript ["C.T."] 181-83). The jury found true the allegations that Petitioner: (1) personally used a firearm within the meaning of California Penal Code section 12022.53(b); (2) personally and intentionally discharged a firearm within the meaning of California Penal Code section 12022.53(c); and (3) personally and intentionally discharged a firearm which proximately caused great bodily injury and death to Jeovanni Acosta within the meaning of California Penal Code section 12022.53(d) (R.T. 858-59; C.T. 181-83). Petitioner received a sentence of fifty years to life (R.T. 885-87; C.T. 257-28).

Petitioner appealed, and also filed a companion habeas petition in the California Court of Appeal (Respondent's Lodgments 3, 6). The Court of Appeal affirmed the judgment and denied the habeas petition (Respondent's Lodgment 7; see People v. Oliva, 2006 WL 3825072 (Cal. Ct. App. 2d Dist. Dec. 29, 2006). The California Supreme Court denied Petitioner's petition for review summarily (Respondent's Lodgment 11).

///
///
///

---

[1] The victim's first name is spelled as both "Jeovanni" and "Giovanni" in the Reporter's Transcript. The Court employs the spelling used in the Information and the verdict form (see C.T. 87-89, 181).

**SUMMARY OF TRIAL EVIDENCE**

**I.  Prosecution's Evidence**

    **A.  Testimony of Ralph Seaton**

Ralph Seaton testified as follows:

Sometime between 5:00 and 6:00 p.m. on October 5, 2002, Seaton stopped at a stop light in his brown car (R.T. 219-20).  Seaton lived in the neighborhood and had seen drug transactions at that particular corner (R.T. 218, 226-27, 247).

Seaton heard a sound "like firecrackers going off" (R.T. 221). Seaton saw a car going very slowly through the intersection (R.T. 221).  Seaton saw a person straddling a bicycle next to the car (R.T. 221, 224).  The person on the bicycle leaned toward the driver's side of the car, and Seaton saw that the person was holding a gun sideways and pointing the gun into the car (R.T. 221-23).  Seaton heard more shots (R.T. 221).  The car moved ahead and struck Seaton's car (R.T. 223-26).  Seaton did not see the man on the bicycle again (R.T. 225). Seaton exited his car, looked into the other car, saw the victim lying on the seat, and saw a considerable amount of blood (R.T. 226, 238). Seaton had never seen the victim before (R.T. 226, 238).

At trial, Seaton could not describe the man on the bicycle, and said he did not pay attention to the man's features (R.T. 244-45, 248).  Seaton did not recall telling police the man was a male

3

1   Hispanic with a medium complexion, dark hair and dark clothing (R.T.

2   228-29).  On cross-examination, Seaton said that he did not recognize

3   Petitioner, and that he, Seaton, could not say whether he saw

4   Petitioner at the intersection that evening or not (R.T. 247-48).  On

5   redirect, Seaton said Petitioner "definitely could have been" at the

6   intersection that night (R.T. 248).

7

8        **B.   Testimony of Maria Cardenas**

9

10       Maria Cardenas testified as follows:

11

12       On the day of the shooting, Maria Cardenas and her two children

13   were visiting Cardenas' mother (R.T. 548-49).  At approximately

14   6:00 p.m., Cardenas was outside putting her children in her van to go

15   home when she noticed approximately five young male Hispanics on

16   bicycles on the corner across the street (R.T. 549-51, 582).  One of

17   the bicyclists was in the intersection riding in circles, yelling and

18   waving his right hand in the air (R.T. 551-55).  Cardenas was not sure

19   if the person had anything in the hand he was waving (R.T. 554).  The

20   person was wearing below-the-knee shorts and a dark jersey-type shirt

21   with stripes near the ends of the sleeves (R.T. 577-79).  Cardenas

22   thought he was a teenager from the way he was dressed (R.T. 582).

23

24       The other bicyclists disappeared (R.T. 555, 577).  Cardenas saw

25   the remaining bicyclist head down the street, and then heard a shot

26   (R.T. 556).  Cardenas told her children to go into the house (R.T.

27   556).  Cardenas saw a car driving very slowly (R.T. 556).  The car's

28   occupant went down and looked dead (R.T. 556, 559).  The car hit a

4

1   brown car driven by an older man (R.T. 557).  Cardenas did not see the

2   person on the bicycle again (R.T. 558).

3

4        Cardenas testified that, as the person circled near Cardenas, she

5   got a good look at him (R.T. 576).  Cardenas said that she was

6   "staring at the scene," and that "[u]nfortunately, [she] did look at

7   his face" (R.T. 579).  However, Cardenas said she testified truthfully

8   at the preliminary hearing that she did not get a good look at the

9   bicyclist's face because she was nearsighted (R.T. 580).  Cardenas

10  said she always wore glasses (R.T. 581-82).

11

12       Cardenas admitted describing the person on the bicycle to police

13  as having a shaved head, but said she meant that he had very short

14  hair (R.T. 582-83).  Cardenas told police the person was between the

15  ages of 18 and 25 and had no facial hair (R.T. 585).

16

17       Asked whether the person she saw riding the bicycle in the middle

18  of the intersection was in court, Cardenas said "I think so" (R.T.

19  560).  The judge asked: "Is there anyone in here who you believe is

20  the individual?" (R.T. 560).  Cardenas said: "I don't know" (R.T.

21  560).  Asked whether there was someone in the courtroom whom Cardenas

22  thought was the person on the bicycle, Cardenas then identified

23  Petitioner (R.T. 560).  Cardenas had never seen Petitioner before the

24  day of the shooting (R.T. 561).  Petitioner looked different in court

25  because he was thinner and had a mustache and more hair (R.T. 562).

26

27       On October 18, 2002, Detective Baker had shown Cardenas a series

28  of photographs (R.T. 563).  Prior to doing so, Baker told Cardenas

1    that the person on the bicycle might or might not be depicted in the

2    photo lineup (R.T. 563, 590).  Cardenas identified Petitioner and

3    circled his picture (R.T. 564).  Cardenas wrote: "Number 3 is the

4    person that to me looks like the guy on the bike before the shooting.

5    He was light skinned Hispanic.  He was heavy set and short.  Hair

6    black or dark brown."  (R.T. 567).  Cardenas said that, although

7    Petitioner looked different in court because Petitioner was thinner

8    and had more hair and more facial hair, Petitioner looked the same as

9    the person she saw on the bicycle (R.T. 564-66).  Cardenas said she

10   also identified Petitioner by the back of his neck and his shoulders

11   (R.T. 566).

12

13        On cross-examination, Cardenas said that, when she picked

14   Petitioner's photograph from the photo lineup, she told the detectives

15   that she was not certain (R.T. 588-89).  The photo lineup appeared to

16   show three older men and two younger men (R.T. 603).  Cardenas said

17   she wavered between the photograph of Petitioner and a photograph from

18   another photo lineup, but finally chose that of Petitioner because he

19   looked more like the person she saw on the bicycle that day (R.T. 589,

20   592, 605).  Cardenas admitting telling the detectives that she chose

21   Petitioner's photograph because of the shape of the face and shoulders

22   (R.T. 591).  Cardenas explained that she had not wanted to say

23   anything, but knew she had to do so, and told the detectives she was

24   afraid and did not want to put the wrong person in jail (R.T. 588-89,

25   592).  When Petitioner's counsel asked: "You simply cannot say with

26   any certainty that [Petitioner] is the person that you saw on the

27   bike, can you?", Cardenas responded: "I don't know because he's thin.

28   He's sitting down right now and his hair is different.  The shape of

his face is different.  It looks like he's thinner.  And -- I don't

know." (R.T. 592-93).  Petitioner's counsel then asked: "So, Ms.

Cardenas, it's true that even today you are not certain whether this

was the individual?" (R.T. 595).  Cardenas replied: "I don't know"

(R.T. 595).


On redirect, the prosecutor said " . . . you saw him [Petitioner]

in the intersection that day?" and Cardenas responded: "yes" (R.T.

601).


C.   **Testimony of E.R.**


E.R., Cardenas' niece, was a six-year-old first grader at the

time of the incident (R.T. 480, 482, 571).  E.R. and her cousin A.R.

were playing outside at the home of E.R.'s grandmother on the day in

question (R.T. 482-83).  E.R. said she saw a person on a bicycle kill

a person in a car (R.T. 484).  Asked if the person on the bicycle was

a boy or a girl, E.R. responded that the person was a boy (R.T. 484).

E.R. said she had seen him before in the neighborhood and recognized

him (R.T. 497, 540).  Asked where E.R. previously had seen the person,

E.R. said: "I forgot" (R.T. 497).


E.R. recalled that the boy on the bike was yelling and saying bad

words before he shot the person in the car (R.T. 485-87).  E.R., who

was approximately fifteen feet away, saw a gun in the right hand of

the shooter prior to the shooting (R.T. 487-88, 499).  E.R. saw only

one person in the car (R.T. 530).  The shooter pointed the gun into

the car, shot the person in the car, and rode away on the bicycle

7

1   (R.T. 488-89).  At first, E.R. said she saw the front windows of the

2   car break, later said she told Detective Baker the back window had

3   been shot, and then said she could not remember which window was shot

4   (R.T. 490-91, 532-33).  E.R. said she saw the boy on the bicycle again

5   two days after the shooting (R.T. 498, 543).

6

7       E.R. said she was sure that she did not see the shooter in the

8   courtroom (R.T. 492-93).  E.R. recalled talking with Detective Baker

9   after the shooting, and recalled that Baker showed her some pictures

10  (R.T. 493).  E.R. said that, when she looked at the pictures, she saw

11  the shooter and picked him out (R.T. 493-97).  E.R. signed the

12  document bearing the photograph and circled the photograph of

13  Petitioner (R.T. 495-96).  E.R. said she saw the shooter's face and

14  was sure she knew who it was (R.T. 500).  Shown a photograph of one of

15  Anthony Tiznado's bicycles, E.R. said the bicycle looked like the one

16  she saw the shooter riding (R.T. 501-02).

17

18      On cross-examination, E.R. said the shooter wore above-the-knee

19  shorts and a black shirt (R.T. 510-12).  Asked whether the person was

20  wearing a dark jacket, E.R. said "yes" (R.T. 510).  Asked what she

21  meant by "jacket," E.R. said "[a] sweater" (R.T. 511).  E.R. said the

22  jacket did not have a hood, but admitted she told the police that the

23  shooter was wearing a dark hooded sweatshirt and that the person did

24  have a hood (R.T. 511, 515-16).  E.R. said that the hood was down, and

25  that the shooter was bald, with a shaved head and no facial hair (R.T.

26  514-16).  E.R. recalled telling Detective Baker she saw two persons in

27  the car (R.T. 531-32).

28  ///

8

1    Also on cross-examination, E.R. said that, when she was shown the

2  photo lineup and asked whether she recognized anyone, she started

3  looking at all of the pictures and then pointed to photograph number 1

4  "because he looked like his face," meaning the face of the person on

5  the bicycle (R.T. 522, 526-27).  E.R. said she changed her selection

6  to photograph number 3, and circled that photograph as Detective Baker

7  requested (R.T. 528-29).  E.R. testified that she thought that one of

8  the photographs must have been that of the shooter, and that she

9  thought she had to make a selection of one of the photographs (R.T.

10  527).

11

12    On redirect, E.R. said she picked photograph number 3 because

13  Detective Baker told her to pick him (R.T. 540-41).  The prosecutor

14  asked: "He told you to pick him or told you to circle the boy that was

15  on the bike?" (R.T. 541).  E.R. said: "Circle the boy who was on the

16  bike" (R.T. 541).  E.R. said that the people in photographs numbered

17  1, 2, 4, 5, and 6 were not the boy on the bicycle, and that the person

18  in photograph number 3 was the boy on the bicycle (R.T. 541-42).  E.R.

19  reiterated that the person in photograph number 3 was the shooter,

20  even though the person in photograph number 3 had hair and a mustache

21  (R.T. 542-43).

22

23    **D.    Testimony of Anthony Tiznado**

24

25    Petitioner's friend Anthony Tiznado, aged 17 at the time of the

26  shooting, testified that he was at home on October 5, 2002 when he

27  heard a loud noise like a firecracker (R.T. 305-06, 362).  A few

28  minutes later, Tiznado went outside to his front porch (R.T. 306-07).

Tiznado saw two cars crash, a blue car and Seaton's brown car (R.T. 309-10, 321-22).  Tiznado saw a crowd of people, a police car, and, on a bike, a friend of his named Antonio who looked like he was crying (R.T. 308-12).  Tiznado thought he remembered telling Detective Baker and the prosecutor that Antonio said Antonio's friend had been shot (R.T. 318).

Tiznado owned three bicycles which he loaned to friends (R.T. 335-36).  Asked whether he loaned his bikes to Petitioner, Tiznado responded: "He don't like riding bikes" (R.T. 336).  Tiznado admitted lending a bike to Petitioner a couple of times, however, and said Tiznado's brother could have loaned Petitioner a bike when Tiznado was not present (R.T. 337).  Tiznado said he had not loaned a bike to Petitioner on the day of the shooting (R.T. 353, 363).

Tiznado thought he saw Petitioner drive his blue El Camino by the location of the incident on the day of the shooting (R.T. 340-41, 345, 353-54, 357-58).  Tiznado said he had seen a person named Valentin driving the blue car in the past (R.T. 322-23).  Tiznado had seen the victim in the past in an area called the Village, and also recalled seeing Petitioner in the Village (R.T. 331, 334).

**E.  Detective Erik Baker**

Detective Baker testified as follows:

Called to the scene, Baker spoke to Ralph Seaton (R.T. 276). Seaton described the shooter as a male Hispanic between the ages of 15

1  and 17 who looked like a gang member and "looked similar to other gang
2  member type people" who hung out on the corner selling drugs (R.T.
3  275-77).  Seaton told Baker that Seaton could not identify the person
4  on the bicycle (R.T. 290, 293).  Baker inspected the victim's car,
5  noting that there was blood on the front seat and that the back window
6  on the driver's side was shattered (R.T. 654-55).

7

8         On October 17, 2002, police arrested Steven Galaviz near the site
9  of the incident for possession for sale of rock cocaine (R.T. 279-80).
10 After interviewing Galaviz, Baker located and followed a blue El
11 Camino containing Petitioner and Anthony Tiznado (R.T. 279-83, 293).
12 The car stopped at Tiznado's residence, near the intersection where
13 the shooting had occurred (R.T. 281-82, 285).  Petitioner initially
14 gave the officers a false name (R.T. 283-87, 433).  According to
15 Baker, Petitioner's appearance at trial looked different from the
16 booking photograph of Petitioner taken on October 18, 2002 (R.T. 295-
17 96).  At trial, Petitioner looked "a lot thinner" and had longer hair
18 (R.T. 297).  Petitioner's hair was "more sketchy" in 2002 and appeared
19 to have been trimmed recently (R.T. 297).

20

21        In a subsequent interview, Tiznado told Baker that Tiznado's
22 bicycles were available for Petitioner's use, and that Petitioner
23 would borrow a bicycle when Petitioner wanted to go to the store (R.T.
24 430-32).  Tiznado told Baker that Petitioner was dating two women, one
25 of whom lived in the Village (R.T. 436).  Steven Galaviz, Tiznado's
26 brother, told Baker that Tiznado permitted Petitioner to borrow
27 Petitioner's bicycles (R.T. 379, 438, 442).
28 ///

1    Baker interviewed Maria Cardenas on October 18, 2002 (R.T. 663).

2  According to Baker, Cardenas was afraid for her safety (R.T. 686,

3  698). Prior to showing Cardenas some photographs, Baker read Cardenas

4  an admonition indicating, <u>inter alia</u>, that the photographs might or

5  might not contain a photograph of the person who committed the crime

6  (R.T. 665-66). Petitioner's booking photograph, taken on October 18,

7  2002, was in position number 3 (R.T. 661-62, 675-76). Cardenas

8  circled photograph number 3 (R.T. 667). Cardenas mentioned that, at

9  the scene of the incident, there was "a whole bunch of people [who]

10  looked like him," and expressed the hope that she was not choosing the

11  wrong person (R.T. 702-03). However, Cardenas told Baker that, on a

12  scale of 1 to 10, Cardenas' level of certainty was 8 or 9 (R.T. 679,

13  698-99).

14

15    Baker showed the photo lineups to Seaton, but Seaton indicated he

16  could not identify anyone (R.T. 673). Baker said Seaton "really

17  didn't look at any of the photos" (R.T. 673).

18

19    Baker interviewed E.R. on October 24, 2002 (R.T. 659). Baker

20  showed a photo lineup to E.R. without first giving E.R. the admonition

21  that the photographs might or might not contain a photograph of the

22  person who committed the crime (R.T. 661). Baker claimed he did not

23  give E.R. this standard admonition because he thought the "verbiage"

24  in the admonition was "a little mature" for E.R. (R.T. 687-88). Baker

25  reportedly did not tell E.R. that she had to pick someone out (R.T.

26  663). Baker asked E.R. whether she recognized anyone in the pictures

27  (R.T. 688). In response, E.R. pointed to photograph number 1, which

28  was a photograph depicting someone other than Petitioner (R.T. 688).

1   Baker asked E.R. where she recognized that person, and E.R. said: "I
2   forgot" (R.T. 691).  Baker asked whether E.R. had seen him around the
3   neighborhood (R.T. 691-92).  Baker supposedly realized that his
4   question had been unclear because he had not asked E.R. to identify
5   the person on the bicycle (R.T. 688).  Baker then said: "Look at all
6   six pictures again and see if you can recognize the guy that was on
7   the bike that night in any of those six pictures" (R.T. 692).  Baker
8   used his finger to point to each of the six photographs and asked
9   whether E.R. recognized that person as the boy on the bike (R.T. 693-
10  94).  Referring to photograph number 1, Baker said: "That's not where
11  you recognize this guy from, is it?" (R.T. 692).  E.R. indicated "no"
12  (R.T. 692-93).  When Baker pointed to photograph number 2, E.R. again
13  indicated "no" (R.T. 694).  When Baker pointed to photograph number 3,
14  E.R. nodded and said "yes" (R.T. 694).  E.R. said the person in
15  photograph number 3 had shot the person in the car (R.T. 694).  E.R.
16  reportedly did not waver in her identification (R.T. 662-63, 695).
17  After E.R. circled the photograph and wrote her name, Baker said:
18  "Awesome." (R.T. 703-04).  Baker then continued through the rest of
19  the photographs (R.T. 694-95).  E.R. did not choose any of the
20  remaining photographs (R.T. 695).

21

22      **F.   Other Prosecution Evidence**

23

24      Steven Galaviz, Tiznado's older brother, testified that Tiznado
25  always kept his bikes locked up (R.T. 379, 385).  Galaviz had not seen
26  Tiznado loan his bikes to friends (R.T. 386).
27  ///
28  ///

13

1   Valentin Rojas testified that he loaned his car to the victim on

2   the day of the shooting (R.T. 638-39).  When the car was returned to

3   Rojas after the shooting, the front and back passenger windows were

4   cracked (R.T. 644-45).

5

6   A deputy medical examiner testified that the victim died from

7   gunshot wounds to the head and scrotum (R.T. 461-68).

8

9   II.  **Defense Case**

10

11   The defense called no witnesses, but introduced a stipulation

12   that eight-year-old A.R. was interviewed at her residence and

13   recounted that, on the day of the incident, A.R. was standing in the

14   front yard of her house when she saw a suspect on a bicycle stopped in

15   the street (R.T. 706).  A.R. said that the victim stopped his car with

16   his driver's window adjacent to the suspect, and A.R. heard the victim

17   and the suspect yelling back and forth (R.T. 706).  A.R. saw the

18   suspect produce a handgun and fire several rounds at the victim (R.T.

19   706).  A.R. heard three shots and the sound of breaking glass (R.T.

20   706).  A.R. described the suspect as a male Hispanic with a shaved

21   head, approximately 16 to 20 years old, wearing a dark-colored hooded

22   sweatshirt, blue denim calf-length shorts and white socks, and riding

23   a small bicycle, possibly a BMX type (R.T. 706).

24

25                       **PETITIONER'S CONTENTIONS**

26

27   Petitioner contends:

28   ///

14

1.   Petitioner's trial counsel allegedly rendered ineffective assistance by: (a) failing to move to suppress E.R.'s pretrial identification; and (b) failing to call an eyewitness identification expert; and

2.   The evidence allegedly was insufficient to support Petitioner's conviction.

## STANDARD OF REVIEW

Under the "Antiterrorism and Effective Death Penalty Act of 1996" ("AEDPA"), signed into law April 24, 1996, a federal court may not grant an application for writ of habeas corpus on behalf of a person in state custody with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d) (as amended); see also Woodford v. Visciotti, 537 U.S. 19, 24-26 (2002); Early v. Packer, 537 U.S. 3, 8 (2002); Williams v. Taylor, 529 U.S. 362, 405-09 (2000).

"Clearly established Federal law" refers to the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.  Lockyer v. Andrade, 538 U.S. 63 (2003).  A state court's decision is "contrary to" clearly established

1  Federal law if: (1) it applies a rule that contradicts governing
2  Supreme Court law; or (2) it "confronts a set of facts. . . materially
3  indistinguishable" from a decision of the Supreme Court but reaches a
4  different result.  See Early v. Packer, 537 U.S. at 8 (citation
5  omitted); Williams v. Taylor, 529 U.S. at 405-06.

6

7      Under the "unreasonable application prong" of section 2254(d)(1),
8  a federal court may grant habeas relief "based on the application of a
9  governing legal principle to a set of facts different from those of
10  the case in which the principle was announced."  Lockyer v. Andrade,
11  538 U.S. at 76 (citation omitted); see also Woodford v. Visciotti, 537
12  U.S. at 24-26 (state court decision "involves an unreasonable
13  application" of clearly established federal law if it identifies the
14  correct governing Supreme Court law but unreasonably applies the law
15  to the facts).

16

17      A state court's decision "involves an unreasonable application of
18  [Supreme Court] precedent if the state court either unreasonably
19  extends a legal principle from [Supreme Court] precedent to a new
20  context where it should not apply, or unreasonably refuses to extend
21  that principle to a new context where it should apply."  Williams v.
22  Taylor, 529 U.S. at 407 (citation omitted).

23

24      "In order for a federal court to find a state court's application
25  of [Supreme Court] precedent 'unreasonable,' the state court's
26  decision must have been more than incorrect or erroneous."  Wiggins v.
27  Smith, 539 U.S. 510, 520 (2003) (citation omitted).  "The state
28  court's application must have been 'objectively unreasonable.'"  Id.

16

1  at 520-21 (citation omitted); <u>see also</u> <u>Davis v. Woodford</u>, 384 F.3d

2  629, 637-38 (9th Cir. 2004).

3

4      In applying these standards, this Court looks to the last

5  reasoned state court decision.  <u>See</u> <u>Delgadillo v. Woodford</u>, 527 F.3d

6  919, 925 (9th Cir. 2008).  If the state courts did not decide a

7  federal constitutional issue on the merits, this Court must consider

8  that issue under a <u>de novo</u> standard of review.  <u>See</u> <u>Pinholster v.</u>

9  <u>Ayers</u>, 525 F.3d 742, 756 (9th Cir. 2008) ("De novo review applies if

10 the state court did not reach the merits of a particular issue.")

11 (citation omitted).

12

13                              **DISCUSSION**

14

15 **I.   <u>Petitioner Is Entitled to Habeas Relief on His Claim That Trial</u>**

16 **<u>Counsel Ineffectively Failed to Move to Suppress E.R.'s Pretrial</u>**

17 **<u>Identification.</u>**

18

19     **A.   <u>Legal Standards</u>**

20

21     To establish ineffective assistance of counsel, Petitioner must

22 prove: (1) counsel's representation fell below an objective standard

23 of reasonableness; and (2) there is a reasonable probability that, but

24 for counsel's errors, the result of the proceeding would have been

25 different.  <u>Strickland v. Washington</u>, 466 U.S. 668, 688, 694, 697

26 (1984) ("<u>Strickland</u>").  A reasonable probability of a different result

27 "is a probability sufficient to undermine confidence in the outcome."

28 <u>Id.</u> at 694.  The court may reject the claim upon finding either that

1   counsel's performance was reasonable or the claimed error was not

2   prejudicial.  Id. at 697; Rios v. Rocha, 299 F.3d 796, 805 (9th Cir.

3   2002) ("Failure to satisfy either prong of the Strickland test

4   obviates the need to consider the other.") (citation omitted).  For

5   purposes of habeas review under 28 U.S.C. section 2254(d), Strickland

6   sets forth clearly established Federal law as determined by the United

7   States Supreme Court.  See Williams v. Taylor, 529 U.S. at 391

8   (citation and quotations omitted).

9

10   Review of counsel's performance is "highly deferential" and there

11   is a "strong presumption" that counsel rendered adequate assistance

12   and exercised reasonable professional judgment.  Williams v. Woodford,

13   384 F.3d 567, 610 (9th Cir. 2004), cert. denied, 546 U.S. 934 (2005)

14   (quoting Strickland, 466 U.S. at 689).  The court must judge the

15   reasonableness of counsel's conduct "on the facts of the particular

16   case, viewed as of the time of counsel's conduct."  Strickland, 466

17   U.S. at 690.  The court may "neither second-guess counsel's decisions,

18   nor apply the fabled twenty-twenty vision of hindsight."  Karis v.

19   Calderon, 283 F.3d 1117, 1130 (9th Cir. 2002), cert. denied, 539 U.S.

20   958 (2003) (citation and quotations omitted); see Yarborough v.

21   Gentry, 540 U.S. 1, 8 (2003) ("The Sixth Amendment guarantees

22   reasonable competence, not perfect advocacy judged with the benefit of

23   hindsight.") (citations omitted).  Where, as here, the record contains

24   counsel's statement of reasons for his or her alleged action or

25   inaction, the issue is whether those reasons were reasonable in the

26   circumstances.  See Moore v. Czerniak, 534 F.3d 1128, 1144 (9th Cir.

27   2008).  Petitioner bears the burden to "overcome the presumption that,

28   under the circumstances, the challenged action might be considered

18

1  sound trial strategy."   Strickland, 466 U.S. at 689 (citation and
2  quotations omitted).

**B.   Discussion**

**1.   Background**

The record includes the transcript of the police interview of
E.R. (see C.T. 210-40).  Detective Baker, assisted by Detective Myers,
conducted the interview.  E.R.'s mother also was present.  Detective
Baker told E.R. that the detectives were going to show her a group of
pictures and said: "I want you to look at all six pictures and just
tell me if you recognize anybody." (C.T. 212).  E.R. said: "Okay."
(C.T. 212).  The following occurred:

> Detective Baker:  And then if you do, tell me where you
> recognize them from or what you recognize about them.  Okay?
>
> We'll call that card A.  Take a look at those faces and
> it's only their faces, but -- you recognize that guy?  From
> where?
>
> [E.R.]:  From -- I forgot.
>
> Detective Baker:  You forgot?  Have you seen him around
> the neighborhood?
>
> [E.R.]:  (No audible response.)

19

1    Detective Baker:  You have?  Do you know -- what

2    happened the other, like, two weeks ago when you were in the

3    front yard, do you remember that, when the guy on the bike

4    and the stuff happened?

5

6        [E.R.]:  (No audible response.)

7

8    Detective Baker:  Do you remember that?  Look at --

9    look at all six pictures again and see if you recognize the

10   guy that was on the bike that night in any of those six

11   pictures.  That's not where you recognize this guy from, is

12   it?

13

14       [E.R.]:  (No audible response.)

15

16   Detective Baker:  No.  Okay.  Well, take -- how about

17   if you look at Number 2, look at ~~that~~² guy, just follow my

18   finger, do you recognize that guy as maybe the guy on the

19   bike?

20

21       [E.R.]:  No.

22

23   Detective Baker:  No?  How about that guy?

24

25   Detective Myers:  You're shaking your head up and down.

26   Okay.

27   _____

        ²   The record does not contain any explanation for the
28   fact that the word "that" appears to have been stricken.

                              20

1   Detective Baker:  Yes?

2

3   [E.R.]:  Yes.

4

5   Detective Baker:  That's the guy that was on the bike

6   that night?

7

8   [E.R.]:  (No audible response.)

9

10   Detective Baker:  Okay.  And did you see what he did?

11

12   [E.R.]:  He had a gun (Inaudible)

13

14   Detective Baker:  They were saying bad words?  Now,

15   this guy, No. 3, was he the guy on the bike?

16

17   [E.R.]:  (No audible response.)

18

19   Detective Baker:  He was on the bike and then there was

20   something [sic] else, right?  Was he in a car?

21

22   [E.R.]:  Uh-huh.

23

24   Detective Baker:  And there was just the two of them

25   and they were saying bad words?

26

27   [E.R.]:  Well, the guy with the bicycle.

28   ///

1          Detective Baker:  Okay.  He was saying bad words, okay,

2     to the guy in the car?  And then you said something about a

3     gun?  He had a gun?

4

5          [E.R.]:  Uh-huh.

6

7          .   .   .

8

9          Detective Baker:  .   .   .  Did you see him shoot the gun?

10

11         [E.R.]:  He shot the guy.

12

13         Detective Baker:  He shot the other guy?  The guy in

14    the car?

15

16         [E.R.]:  He hit the guy who was in the back of the car.

17

18         Detective Baker:  Okay.  Do you remember how many times

19    he shot the gun?

20

21         [E.R.]:  One time

22

23         .   .   .

24

25         Detective Myers:  How are you feeling?

26

27         [E.R.]:  Fine.

28  ///

1    Detective Myers:  Yeah?  Is school going okay?

2

3    [E.R.]:  (No audible response)

4

5    Detective Myers:  You know, sometimes bad things happen

6    and we don't like them to happen, but when they do we have -

7    - our job is to go out and find that bad guy, okay?

8

9    And we talk to people like you and other people that

10   help us find that bad guy and then we can catch them and

11   then he can go to jail.  Cause that's what bad guys should -

12   - that's where they should go, right?  Okay.  So you did a

13   great job.  You did a awesome job.  Okay?  So I just want

14   you to feel real good about yourself, okay?

15

16   Detective Baker:  Excellent.  . . .  I'm sorry to make

17   you look at this again, but just to clear this up since we

18   looked at 1 and 2 and you said they were the guy on the bike

19   [sic], I just want you to look, at this one, Number 4, does

20   he look familiar?

21

22   [E.R.]:  (No audible response.)

23

24   Detective Baker:  No?  Can you say it out loud for me --

25

26   [E.R.]:  Huh-uh.

27

28   Detective Baker:  -- instead of shaking your head --

23

1   no?  Okay.  And Number 5, does he look familiar?

2

3        [E.R.]:  No.

4

5        Detective Myers:  No?

6

7        Detective Baker:  No?  Okay, and Number 6?

8

9        [E.R.]:  No.

10

11       Detective Baker:  Okay.  Just Number 3.  Okay.  Do you

12   know what a circle is?

13

14       [E.R.]:  (No audible response.)

15

16       Detective Baker:  If I give you the pen, do you think

17   you can circle No. 3? -- Awesome, okay.

18

19       Detective Myers:  Do you know how to write your name?

20

21       [E.R.]:  (No audible response.)

22

23       Detective Myers:  Could you write your name right there

24   below that?

25

26       [E.R.]:  Right here?

27

28       Detective Myers:  Either there or right below.  Either

24

1    one is fine.

2

3         Detective Baker:  Wow.

4

5              .   .   .

6

7         Detective Myers:  [E.], this is very important for us,

8    okay?  And like I say, you've done a fantastic job and I'm

9    very proud of you.  You should be proud of yourself.

10

11        And I just want to make sure this is the person right

12   here is the person you saw on the bicycle that said the bad

13   words.  Yes or -- yes or no?

14

15        [E.R.]:  Yes.

16

17             .   .   .

18

19   (C.T. 212-20).

20

21      E.R. told the detectives that she saw two people in the car, that

22   one of the people got out of the car, and that the back window of the

23   car was broken (C.T. 233-37).  Detective Baker asked E.R. if she had

24   seen the shooter before (C.T. 215).  E.R. gave no audible response,

25   but Baker said: "No, you hadn't seen him ever before?  Have you seen

26   him since that night?" (C.T. 215).  E.R. said she had seen the person

27   twice after the incident (C.T. 215).  Later, E.R. said she had seen

28   the person before (C.T. 227).

                                  25

1    In his motion for a new trial, Petitioner contended that trial
2  counsel was ineffective for failing to object to the admission of
3  E.R.'s pretrial identification (C.T. 197-203). The trial court
4  rejected this contention, saying: "Looking at the overall trial,
5  looking at the area regarding the – that particular child's
6  identification, I cannot say that counsel's performance was so deficit
7  [sic] when measured up against the standard of a reasonable competent
8  attorney." Id. Petitioner raised this claim on appeal and in the
9  habeas petition filed in the Court of Appeal (Respondent's Lodgments
10  3, 6). In support of the claim, Petitioner submitted the declaration
11  of trial counsel (Respondent's Lodgment 6, Ex. 4). Petitioner also
12  relies on this declaration in the present proceeding (see Pet. Mem.,
13  Ex. B). In the declaration, trial counsel stated that he never moved
14  to suppress the identification because he "did not believe there was
15  sufficient evidence to show police coercion or suggestiveness to the
16  extent that the eyewitness evidence could be the subject of a
17  successful suppression motion" (Respondent's Lodgment 6, Ex. 4, ¶ 8;
18  see Pet. Mem., Ex. B, ¶ 8).

19

20    The Court of Appeal ruled that the procedure used was not unduly
21  or unnecessarily suggestive (Respondent's Lodgment 7, pp. 6-8; People
22  v. Oliva, 2006 WL 3825072, at *4). The Court of Appeal stated that
23  the officer did not cause Petitioner's photograph to stand out from
24  the others in a way that suggested to E.R. that she should select
25  Petitioner's photograph (Respondent's Lodgment 7, p. 7; People v.
26  Oliva, 2006 WL 3825072, at *4). The Court of Appeal stated that the
27  officer did not "signal" a choice to E.R. by praising her or by asking
28  her the details of the crime following her identification of

1  States, 390 U.S. 377, 384 (1968); see also Manson v. Brathwaite, 432

2  U.S. 98, 114 (1977); Neil v. Biggers, 409 U.S. 188, 198 (1972); People

3  v. Gordon, 50 Cal. 3d 1223, 1242-43, 270 Cal. Rptr. 451, 792 P.2d 251

4  (1990), cert. denied, 499 U.S. 913 (1991), overruled on other grounds,

5  People v. Edwards, 54 Cal. 3d 787, 835, 1 Cal. Rptr. 2d 696, 819 P.2d

6  436 (1991), cert. denied, 506 U.S. 841 (1992).   However, the admission

7  of an identification that followed a suggestive identification

8  procedure does not violate due process if the identification is

9  reliable under the totality of the circumstances.   See Manson v.

10  Brathwaite, 432 U.S. at 111-14; United States v. Dring, 930 F.2d 687,

11  693 (9th Cir. 1991), cert. denied, 506 U.S. 836 (1992); People v.

12  Ochoa, 19 Cal. 4th 353, 412, 79 Cal. Rptr. 2d 408, 966 P.2d 442

13  (1998), cert. denied, 528 U.S. 862 (1999).

14

15      Here, the identification procedure was so clearly suggestive that

16  the Court of Appeal's contrary decision was objectively unreasonable.

17  The detectives never admonished E.R. that the photographic lineup

18  might or might not contain a photograph of the suspect.   Such an

19  admonition is extremely important to avoid suggestiveness in the

20  presentation of a photographic lineup to an adult witness.[3]   Such an

21  _____

22      [3]   See Gary L. Wells, "Eyewitness Identification
   Procedures: Recommendations for Lineups and Photospreads," 22 Law
23  and Human Behavior No. 6 (1998) at pp. 11, 23, available at
   www.psychology.iastate.edu/faculty/gwells/whitepaperpdf.pdf
24  (characterizing such an admonition as "essential," after
   surveying empirical studies demonstrating that the absence of
25  such an admonition causes witnesses to select the person in the
   lineup or photo spread who looks most like the perpetrator, even
26  when the perpetrator is not in the lineup or photo spread);
27  accord Pat Priest, "Eyewitness Identification and the Scientific
   Method," 65 Texas B.J. 974 (2002); see also California Commission
28                                                    (continued...)

1   admonition is even more critical to avoid suggestiveness in the

2   presentation of a photographic lineup to a six-year-old child.  Baker

3   claimed he did not admonish E.R. because "she would not understand the

4   mature language" in the standard admonition (see Respondent's Lodgment

5   7, p. 7; People v. Oliva, 2006 WL 3825072, at *4).  Yet, neither

6   detective made any attempt to rephrase the standard admonition into

7   simpler language, assuming the language of the standard admonition

8   really was too "mature" for E.R.[4]  Neither detective made any attempt

9   to make sure E.R. understood that the photographs she viewed might or

10  might not contain a photograph of the perpetrator.  Indeed, E.R. in

11  fact believed that the group of photographs necessarily did contain a

12  photograph of the perpetrator.  She testified at trial that she

13  thought that one of the photographs must have been that of the

14  perpetrator, and that she thought she "had to make a selection of one

15  of these pictures" (R.T. 527-28).  The Court of Appeal never mentioned

16  E.R.'s trial testimony concerning her belief that the photographic

17  lineup contained the perpetrator's photograph and that she had to make

18  a selection.

19  ///

20

21  ───────────────

22  [3](...continued)
    on the Fair Administration of Justice, Final Report (2008),
    available at www.ccfa.org/documents/CCFAJFinalReport.pdf (After
23  four-year study, the Commissioners (including the California
    Attorney General and the Chief of the Los Angeles Police
24  Department) recommended, inter alia, that "[a]ll witnesses should
    be instructed that a suspect may or may not be in a photo spread,
25  lineup or show-up . . .).

26  ───────────────
    [4]    The admonition Detective Baker gave to Cardenas began,
27  rather simply, "In a moment I am going to show you a group of
    photographs.  This group of photographs may or may not contain a
28  picture of the person who committed the crime . . ." (R.T. 666).

1    Detective Baker put together the photo lineup containing
2  Petitioner's booking photograph, and hence knew which photograph was
3  Petitioner's (see R.T. 675-76).  When Detective Baker first asked E.R.
4  from where she recognized the person in photo number 1, E.R. said: "I
5  forgot."  Baker asked her if she had seen that person around the
6  neighborhood, and she apparently answered affirmatively.  Baker then
7  asked her if she recognized the person on the bike in any of the six
8  pictures, utilizing the leading question "That's not where you
9  recognize this guy [the person in photograph number 1], is it?"  Baker
10  thus suggested to E.R. that the person in photograph number 1 was not
11  the shooter.[5]  The Court of Appeal noted this exchange without
12  mentioning the fact that Baker thereby effectively suggested to E.R.
13  that she should eliminate the person in photograph number 1 as the
14  perpetrator.

15

16    Furthermore, after E.R. had identified Petitioner's photograph,
17  but before Baker asked E.R. about photographs 4, 5 or 6, Detective
18  Myers told E.R. that the officers' job was to find "that bad guy" and
19  put him in jail.  Detective Myers praised E.R., saying she had done an
20  "awesome" job.  Not surprisingly, after having been praised for doing
21  an awesome job helping the police put "that bad guy" in jail, E.R.
22  failed to identify any of the people in the remaining three
23  photographs as the person on the bicycle; none of them was "that bad
24  guy" she already had done such an "awesome" job identifying.  The

25

26    _____

27    [5]    It was of course possible that E.R. could recognize a
   person in one of the photographs both as someone she had seen
   previously in the neighborhood and also as the person on the
28  bicycle.

30

detectives thus effectively eliminated the persons in photographs 4, 5
and 6 before asking E.R. specifically if any of those persons were the
person on the bicycle. Detective Baker also praised E.R. for a
"fantastic job" before asking her again whether the person she had
identified was the person on the bicycle. Such a young child easily
could have decided she should complete her "awesome" and "fantastic"
job by reaffirming that Petitioner was the person on the bicycle.

The Court of Appeal concluded that the interviewing officer did
not "signal" a choice to E.R. and did not praise her for making the
"right" choice. These conclusions unreasonably fly in the face of the
undisputed evidence of record. As indicated above, the detectives did
signal to E.R. that the persons in photographs 1, 4, 5 and 6 were not
the perpetrator. Moreover, immediately after E.R. chose Petitioner's
photograph, and before she was asked about the remaining photographs,
E.R. was told she "did" (in the past tense) a "great" and "awesome"
job and should feel "real good" about herself. In such circumstances,
any person, much less a child of six, easily could have understood she
was being told she had made the "right" choice.

To prove a Strickland violation, Petitioner must show a
reasonable probability that, had counsel made the motion, the motion
would have been granted. See Styers v. Schriro, 2008 WL 4661819, at
*2. A motion to suppress an identification made during a suggestive
procedure will be denied when the identification nevertheless was
"reliable." Id. Because the Court of Appeal unreasonably determined
that the identification procedure was not suggestive, the Court of
Appeal never reached the reliability prong of the analysis.

1     Had counsel filed a motion to suppress, and had the state court
2 correctly determined that the identification procedure was suggestive,
3 the court would have confronted the reliability issue.  The "central
4 question" is "whether under the 'totality of the circumstances' the
5 identification is reliable even though the confrontation procedure was
6 suggestive."  Neil v. Biggers, 409 U.S. at 199.  The factors to be
7 considered in evaluating the reliability of an identification after a
8 suggestive procedure include:

9

10       the opportunity of the witness to view the criminal at the
11       time of the crime, the witness' degree of attention, the
12       accuracy of the witness' prior description of the criminal,
13       the level of certainty demonstrated by the witness at the
14       confrontation, and the length of time between the crime and
15       the confrontation.

16

17 Neil v. Biggers, 409 U.S. at 199-200; see also People v. Gordon, 50
18 Cal. 3d at 1242-43 (citation omitted).  Where the reliability of an
19 identification by a child witness is at issue, a court also should
20 consider the child's age.  See, e.g., Haliym v. Mitchell, 492 F.3d
21 680, 706-07 (6th Cir. 2007) (seven year old age of witness "counsels
22 against a finding of reliability.  Studies show that children are more
23 likely to make mistaken identifications than are adults") (citations
24 and quotations omitted); Bryant v. Commonwealth, 10 Va. App. 421, 425,
25 393 S.E.2d 216 (1990) ("The witness' youthfulness is obviously a
26 factor to be considered under the [Manson v.] Brathwaite totality of
27 circumstances test.").
28 ///

1    Here, the witness' opportunity to view the criminal was

2 fleeting.[6]  E.R. testified she saw the incident from a distance of

3 approximately fifteen feet, but she also testified she did not watch

4 the boy on the bicycle and the car during the entire incident (R.T.

5 496).  E.R. testified that the shooter's back was toward E.R. when he

6 was yelling at the person in the car, but claimed that she saw his

7 face when he fired the shot (R.T. 496, 499, 500).  She also said that

8 the shooter was not facing her when he bicycled away, although she

9 claimed she saw his face as he rode away (R.T. 500).  During the brief

10 incident, E.R. also reportedly focused her attention on the broken car

11 window and the gun, which she said she saw fired only once (C.T. 215).

12 Thus, it appears E.R. had only a very limited opportunity to view the

13 perpetrator's face.  The factors of the witness' opportunity to view

14 the criminal and the witness' degree of attention do not weigh in

15 favor a finding of reliability.

16

17    With respect to the accuracy of a prior description, the record

18 does not contain any direct evidence regarding Petitioner's appearance

19 or attire on the day of the incident.  Consequently, the only

20 comparisons available are comparisons between E.R.'s description and

21 other witnesses' descriptions of the person on the bicycle.  E.R.

22 testified that, on the night of the shooting, she told police that the

23

24    [6]    Maria Cardenas testified that she watched the person on
25 the bicycle for "maybe ten seconds at the most" as he circled
   around in the intersection (R.T. 554-55).  After Cardenas
26 finished buckling her children into the car, she looked up and
   saw that the other bicyclists had disappeared, and the person she
27 had seen circling in the intersection was still yelling (R.T.
   576).  The person on the bicycle disappeared, and Cardenas heard
28 a shot approximately five seconds later (R.T. 558, 576).

1  person on the bicycle was bald, had a shaved head, and no facial hair

2  (R.T. 514-15).  This description was fairly consistent with the

3  description by Cardenas (see R.T. 582-83, 585).  However, the

4  description apparently fit a number of people Cardenas saw that day in

5  that place.  Cardenas said all the young men she saw riding bikes were

6  young male Hispanics wearing shorts (R.T. 582, 599).  Also, at the

7  time of Cardenas' pretrial identification of Petitioner's photograph,

8  Cardenas told police, "To me like as soon as everybody started getting

9  together, and they were like a whole bunch of people looked [sic] like

10  him," and said she hoped she was not "making the wrong" (R.T. 702-03).

11  E.R. also said she told police that the person was wearing a dark

12  jacket or sweatshirt with a hood, but at trial E.R. said there was no

13  hood (R.T. 511, 515).  A.R. told police the shooter wore a dark-

14  colored hooded sweatshirt (R.T. 706).  Cardenas said the person wore a

15  dark jersey-type shirt and did not wear a jacket or hooded sweatshirt

16  (R.T. 577-78).  Because the record contains no direct evidence of

17  Petitioner's actual appearance on the day of the incident, because

18  E.R.'s prior description fit a number of other people at the scene,

19  and because she gave inconsistent descriptions of the shooter's

20  attire, this factor does not weigh in favor a finding of reliability.

21

22      E.R.'s identification occurred approximately two weeks after the

23  shooting, a relatively short length of time.  See United States v.

24  Barrett, 703 F.2d 1076, 1085 (9th Cir. 1983).  This factor militates

25  in favor of reliability.

26

27      With respect to E.R.'s level of certainty, as indicated above,

28  E.R. expressed certainty at trial that the person she had identified

34

1   in the interview was the person on the bicycle, and Detective Baker

2   testified that E.R. did not "waver" in her identification of

3   Petitioner's photograph during the pretrial interview.  However, E.R.

4   testified that, when she was shown the photo lineup and asked whether

5   she recognized anyone, she started looking at all of the pictures and

6   then pointed to photograph number 1 "because he looked like his [i.e.,

7   the perpetrator's] face,"[7] but later changed her selection to

8   photograph number 3 (R.T. 522, 526, 528-29).  Moreover, E.R.'s

9   expressions of confidence in her pretrial identification prove little

10  concerning the reliability of the identification, given the patent

11  suggestiveness of the identification procedure, including the

12  detective's leading question preceding E.R.'s withdrawal of her

13  selection of photograph number 1 and the detectives' praise for E.R.'s

14  performance following her identification of photograph number 3.

15  Additionally, at trial E.R. could not identify anyone in the courtroom

16  as the perpetrator (R.T. 492-93).[8]  In fact, at trial E.R. said she

17  was sure she did not see the person on the bicycle in the courtroom

18  (R.T. 493).  Consideration of all of these circumstances casts grave

19  doubt on the reliability of E.R.'s expressions of certainty in her

20  identification, and militates strongly in favor of the conclusion that

21  her identification was not reliable.

22  ///

23  ///

24  ────────────────────

25      [7]   Thus, E.R.'s initial selection of photograph 1 was, in
    E.R.'s mind, an initial identification of the perpetrator, rather
26  than merely an identification of someone E.R. had seen before.

27      [8]   Although at trial Petitioner was thinner and had longer
    hair and a mustache, all of the persons in the photo lineup
28  containing Petitioner's photographs had mustaches (R.T. 589).

1    Based on the factors discussed above, a reasonable and objective
2    evaluation of the "totality of the circumstances" would conclude that
3    E.R.'s identification was not reliable.  Therefore, had Petitioner's
4    counsel made a motion to suppress, it is reasonably probable that the
5    trial court, faithfully applying the principles set forth in Supreme
6    Court case law, would have concluded not only that the identification
7    procedure was suggestive but also that E.R.'s identification was not
8    sufficiently reliable to warrant its introduction at trial.

9

10    Accordingly, the Court of Appeal's ruling that Petitioner's
11   counsel made a reasonable "tactical" decision not to bring a motion to
12   suppress was an objectively unreasonable ruling.  Counsel's supposedly
13   "tactical" decision rested on counsel's alleged belief that the
14   identification procedure used was not sufficiently suggestive.[9]  Given
15   the patent suggestiveness of the procedure used, and the unreliability
16   of the identification, counsel's alleged belief (and counsel's
17   inaction assertedly predicated thereon) fell below any objective
18   standard of reasonableness.

19

20    The final issue in the ineffectiveness analysis is whether the
21   failure to suppress E.R.'s identification prejudiced Petitioner, i.e.,
22   whether there would have been a reasonable probability of a different
23   result at trial had counsel made the motion to suppress and had the

24

25

26
_____

27    [9]    Petitioner's counsel admitted he believed that E.R.'s
     identification of Petitioner was "unreliable" (Respondent's
28   Lodgment 6, Ex. 4, ¶ 7; see Pet. Mem., Ex. B, ¶ 7).

1   court granted the motion.[10]  In the absence of E.R.'s statements, the
2   prosecution's case would have rested almost entirely on the pretrial
3   and in-court identifications of Maria Cardenas.  Although the
4   prosecution introduced evidence that Petitioner had access to
5   Tiznado's bicycles, the evidence showed that other people also had
6   access to Tiznado's bicycles.  Other evidence, such as testimony that
7   Petitioner was in the neighborhood on the day of the incident, that
8   Petitioner initially gave a false name when arrested, that other
9   witnesses may have lied, or that Petitioner had several girlfriends
10  and frequented an area which the victim also visited, had scant
11  incriminating, probative value.  The trial court aptly commented that
12  "this case kind of rises and falls with the eyewitness'
13  identification" (R.T. 722).

14

15       Thus, in the absence of E.R.'s identification, the prosecution's
16  case essentially would have stood or fallen based on the strength of
17  Cardenas' identifications of Petitioner.  Cardenas' identifications of
18  Petitioner were not strong.  Cardenas did not confidently identify
19  Petitioner in court.  Rather, she displayed a notable lack of
20  certainty.  Asked whether the person riding the bicycle in the middle
21  of the intersection was in court, Cardenas said: "I think so" (R.T.
22  560).  When the court then asked whether there was anyone in court
23  whom Cardenas believed was that individual, Cardenas said: "I don't
24  know" (R.T. 560).  Thereafter, when the prosecutor asked Cardenas
25  whether there was someone in court whom Cardenas "thought" was the
26  person on the bicycle, Cardenas identified Petitioner (R.T. 560).

27
    _____
28       [10]    Of course, the Court of Appeal never reached this
    issue.

37

1    Cardenas testified on direct examination that she got a "good

2    look" at the person on the bicycle (R.T. 576).  However, on cross-

3    examination Cardenas said she was telling the truth at the preliminary

4    hearing when she testified that she did not get a "good look" at that

5    person, and when she testified: "It just looked a little bit too far

6    to be concentrated on the face and I am nearsighted" (R.T. 580).

7    Petitioner's counsel asked Cardenas: "You simply cannot say with any

8    certainty that he [Petitioner] is the person that you saw on the bike,

9    can you?" (R.T. 592).  Cardenas replied: "I don't know because he's

10   thin.  He's setting down right now and his hair is different.  The

11   shape of his face is different.  And -- I don't know." (R.T. 593).

12

13   With respect to the pretrial identification, Cardenas testified

14   that, when she viewed the photo lineup, she narrowed her choice to two

15   pictures, but finally chose Petitioner's because he "look[ed] like"

16   the person on the bicycle (R.T. 567, 589).  Cardenas admitted that she

17   told the detectives that she was not certain about her identification

18   of Petitioner's photograph, and told them that she did not get a good

19   look at the person's face (R.T. 588-89, 591).

20

21   The record suggests that, even with the evidence of E.R.'s

22   pretrial identification, the jury struggled with the central issue of

23   identification.  The jury deliberated for approximately two and a half

24   days before reaching a verdict (C.T. 120-21, 125-27, 182-83).  On the

25   first full day of deliberations, the jury sent the court three notes,

26   two of which requested readbacks of: (1) "Maria Cardenas' testimony

27   re: description of the guy she saw circling on the bike and her

28   identification on Oct. 18 from the six-pack"; and (2) "[E.R.]'s

1  testimony re: description of the 'boy on the bike' and identification
2  on Oct 18 from the six pack" (C.T. 123-24).[11]  The readbacks occurred
3  the next afternoon, but the jury still did not reach a verdict until
4  late the following morning (C.T. 182-83).   The length of the
5  deliberations and the jury's requests for readbacks of Cardenas' and
6  E.R.'s testimony concerning their identifications strongly suggest
7  that the jury had some difficulty with the identification evidence.
8
9       Considering Cardenas' expressed lack of certainty in her in-court
10  and pretrial identifications of Petitioner, and considering the jury's
11  evident struggle to reach a verdict even with the evidence of E.R.'s
12  identification, it is reasonably probable that, without E.R.'s
13  identification, the trial would have yielded a different outcome.
14  Therefore, Petitioner is entitled to habeas relief on this claim.[12]
15
16  II.  **The Evidence Was Sufficient to Support Petitioner's Conviction.**
17
18       A.  **Legal Standards**
19
20       Although Petitioner is entitled to habeas relief on his claim
21  that trial counsel ineffectively failed to move to suppress E.R.'s
22  identification, the Court nevertheless must evaluate the sufficiency
23

24       [11]    The third note requested a readback of Detective
25  Baker's testimony regarding his interview with Galaviz concerning
    how Baker came to look for the car identified at trial as
26  Petitioner's (C.T. 122).

27       [12]    In light of this conclusion, the Court need not, and
    does not, determine the merits of Petitioner's claim that counsel
28  ineffectively failed to call an eyewitness identification expert.

1  of the trial evidence, "as the Double Jeopardy Clause would preclude

2  retrial if the evidence were insufficient." See Bean v. Calderon, 163

3  F.3d 1073, 1086 (9th Cir. 1998), cert. denied, 528 U.S. 922 (1999)

4  (citation omitted).  "The double jeopardy clause does not bar retrial

5  after a reversal based on the erroneous admission of evidence if the

6  evidence erroneously admitted supported the conviction." United

7  States v. Chu Kong Lin, 935 F.2d 990, 1001 (9th Cir. 1991).  Thus,

8  even if a court determines that the evidence is insufficient to

9  support a conviction without the improperly admitted evidence, if the

10 evidence is sufficient when the improperly admitted evidence is

11 considered, the Double Jeopardy Clause allows retrial.  See Lockhart

12 v. Nelson, 488 U.S. 33, 40-42 (1988).  "[A] reviewing court must

13 consider all of the evidence admitted by the trial court in deciding

14 whether retrial is permissible under the Double Jeopardy Clause. . .

15 ." Lockhart v. Nelson, 488 U.S. at 41.

16

17      On habeas corpus, the Court's inquiry into the sufficiency of

18 evidence is limited.  Evidence is sufficient unless the charge was "so

19 totally devoid of evidentiary support as to render [Petitioner's]

20 conviction unconstitutional under the Due Process Clause of the

21 Fourteenth Amendment." Fish v. Cardwell, 523 F.2d 976, 978 (9th Cir.

22 1975), cert. denied, 423 U.S. 1062 (1976) (citations and quotations

23 omitted).  The evidence is to be considered "in the light most

24 favorable to the prosecution." Wright v. West, 505 U.S. 277, 296

25 (1992) (plurality opinion) (quoting Jackson v. Virginia, 443 U.S. 307,

26 319 (1979)).  A conviction cannot be disturbed unless the Court

27 determines that no "rational trier of fact could have found the

28 essential elements of the crime beyond a reasonable doubt." Wright v.

1  West, 505 U.S. at 284; Jackson v. Virginia, 443 U.S. at 317.

2

3      A reviewing court "faced with a record of historical facts that

4  supports conflicting inferences must presume -- even if it does not

5  affirmatively appear in the record -- that the trier of fact resolved

6  any such conflicts in favor of the prosecution, and must defer to that

7  resolution."  Jackson v. Virginia, 443 U.S. at 326.  "The reviewing

8  court must respect the exclusive province of the fact finder to

9  determine the credibility of witnesses, resolve evidentiary conflicts,

10  and draw reasonable inferences from proven facts."  United States v.

11  Hubbard, 96 F.3d 1223, 1226 (9th Cir. 1996); see also Jones v. Wood,

12  114 F.3d 1002, 1008 (9th Cir. 1997).  "[T]he prosecution need not

13  affirmatively rule out every hypothesis except that of guilt."  Wright

14  v. West, 505 U.S. at 296.  This Court cannot grant habeas relief on

15  Petitioner's challenge to the sufficiency of the evidence unless the

16  state court's decision constituted an "unreasonable application of"

17  Jackson v. Virginia.  See Juan H. v. Allen, 408 F.3d 1262, 1274-75

18  (9th Cir. 2005), cert. denied, 546 U.S. 1137 (2006).

19

20      B.   **Discussion**

21

22      Petitioner contends the evidence was insufficient to show

23  Petitioner was the shooter.  Petitioner raised this contention in a

24  motion for a new trial filed in the Superior Court (C.T. 193-240).

25  The Superior Court denied the motion, deeming the evidence sufficient

26  (R.T. 880-81).  The Court of Appeal agreed.  The Court of Appeal

27  identified the "proper test for determining a claim of insufficiency"

28  as "whether, on the entire record, a rational trier of fact could find

41

1   the defendant guilty beyond a reasonable doubt" (Respondent's Lodgment

2   7, pp. 2-3 ; see People v. Oliva, 2006 WL 3825072, at *1).  This

3   formulation comports with the Jackson v. Virginia standard.[13]  The

4   Court of Appeal ruled that Petitioner's arguments went to the weight

5   of the evidence, not its sufficiency, and that Petitioner had not

6   shown physical impossibility or inherent improbability (Respondent's

7   Lodgment 7, p. 5; see People v. Oliva, 2006 WL 3825072, at *1-3).  The

8   Court of Appeal concluded that a "reasonable jury" could have found

9   Petitioner guilty beyond a reasonable doubt (Respondent's Lodgment 7,

10  p. 5; see People v. Oliva, 2006 WL 3825072, at *1-3).

11

12      Reasoning in the recent decision of Brown v. Farwell, ___ F.3d __

13  , 2008 WL 2789254 (9th Cir. July 21, 2008), pet. for cert. filed (Oct.

14  24, 2008) (No. 08-559) points out a flaw in the Court of Appeal's

15  decision in the present case.  In Brown v. Farwell, the Ninth Circuit

16  held that the Nevada Supreme Court's decision upholding the

17  sufficiency of the evidence was "contrary to" Jackson v. Virginia.

18  The Ninth Circuit so concluded because, among other things, the Nevada

19  Supreme Court's articulated standard for determining evidentiary

20  sufficiency required a determination whether a "reasonable" jury could

21  have found the defendant's guilt beyond a reasonable doubt, rather

22  than whether a "rational" jury could have done so.  In Petitioner's

23  case, the Court of Appeal initially articulated the correct "rational"

24  juror standard, but concluded its discussion by stating that a

25  _____

26      [13]  ~~In support of this standard, the Court of Appeal cited~~

27  a state case, People v. Jones, 51 Cal. 3d 294, 314, 270 Cal.
    Rptr. 611, 792 P.2d 643 (1990).  People v. Jones cites People v.

28  Barnes, 42 Cal. 3d 284, 303, 228 Cal. Rptr. 228, 721 P.2d 110
    (1986), which in turn cites, inter alia, Jackson v. Virginia.

1  "reasonable" jury could have found Petitioner guilty beyond a

2  reasonable doubt.   According to Brown v. Farwell, application of the

3  latter standard would have been "contrary to" Jackson v. Virginia.

4  Where a state court applies an incorrect legal standard, a federal

5  habeas court's review is de novo.   See Frantz v. Hazey, 533 F.3d 724,

6  735 (9th Cir. 2008 (en banc) ("we may not grant habeas relief simply

7  because of § 2254(d)(1) error and that, if there is such error, we

8  must decide the habeas petition by considering de novo the

9  constitutional issues raised"); Delgadillo v. Woodford, 527 F.3d at

10  925.

11

12       In the present case, it is unclear which of the two articulated

13  standards ("rational" or "reasonable") the Court of Appeal actually

14  applied.   However, this Court need not determine which standard the

15  Court of Appeal applied.   Regardless of whether this Court utilizes a

16  de novo standard of review or the more deferential AEDPA standard, the

17  Court concludes that the evidence was constitutionally sufficient to

18  support Petitioner's conviction.

19

20       A rational trier of fact could have concluded from the testimony

21  of Cardenas and E.R.[14] that Petitioner was the shooter.   Although, as

22  discussed above, Maria Cardenas' identifications were not strong,

23  Cardenas did testify that Petitioner looked like the person she saw on

24  the bicycle, and Detective Baker testified that Cardenas told

25

26  _____

27       [14]   In the sufficiency analysis, the reviewing court must
consider all of the evidence admitted by the trial court, even
evidence admitted erroneously.   See Lockhart v. Nelson, 488 U.S.

28  at 41-42.

detectives that her level of certainty with respect to her pretrial
identification was 8 to 9 on a scale of 1 to 10.  E.R. could not
identify Petitioner at trial, but she testified that she had seen
Petitioner before the shooting, that she had identified Petitioner's
photograph as that of the person on the bicycle, and that she was sure
it was he.[15]  "Identification of the defendant by a single eyewitness
may be sufficient to prove the defendant's identity as the perpetrator
of a crime."  People v. Boyer, 38 Cal. 4th 412, 480, 42 Cal. Rptr. 3d
677, 133 P.3d 581 (2006), cert. denied, 127 S. Ct. 556 (2006)
(citation omitted); see also United States v. McClendon, 782 F.2d 785,
790 (9th Cir. 1986) (testimony of one eyewitness, even where
inconsistent with other evidence, suffices to support a conviction).
"Moreover, a testifying witness's out-of-court identification is
probative for that purpose and can, by itself, be sufficient evidence
of the defendant's guilt even if the witness does not confirm it in
court."  People v. Boyer, 38 Cal. 4th at 480 (citation omitted).
"[T]estimony that a defendant resembles the [perpetrator] [citations],
or looks like the same [citations], has been held sufficient."  People
v. Jackson, 183 Cal. App. 2d 562, 568, 6 Cal. Rptr. 884 (1960); see
also People v. Cooks, 141 Cal. App. 3d 224, 278, 190 Cal. Rptr. 211
(1983), cert. denied, 464 U.S. 1046 (1984) (testimony of single
eyewitness who was "90 percent sure" of his identification
sufficient); United States v. Smith, 563 F.2d 1361, 1363 (9th Cir.
1977), cert. denied, 434 U.S. 1021 (1978) (statement that defendant

---

[15]   Compare Brown v. Farwell, 2008 WL 2789254, at *8
(evidence insufficient where, among other things, child witness
identified petitioner as her attacker, but also twice identified
petitioner's brother as the assailant).

1 | "look[ed] like" the perpetrator sufficient).

2

3 | Although Petitioner points to alleged discrepancies in the

4 | witnesses' testimony, it was the province of the jury to credit the

5 | evidence showing that Petitioner was the shooter. See United States

6 | v. Ginn, 87 F.3d 367, 369 (9th Cir. 1996) ("The evidence is not

7 | rendered insufficient simply because there are discrepancies in the

8 | eyewitnesses' descriptions of the robber."); see also Gibbs v. Kemna,

9 | 192 F.3d 1173, 1175-76 (8th Cir. 1999), cert. denied, 531 U.S. 846

10 | (2000) (rejecting challenge to sufficiency of evidence based on

11 | alleged unreliability of witness identifications; petitioner's

12 | arguments went to witnesses' credibility, not the sufficiency of the

13 | evidence, and "credibility is for the jury to decide") (citation

14 | omitted); United States v. Brewer, 36 F.3d 266, 269-70 (2d Cir. 1994)

15 | (witnesses' statements that defendant "resembled" or "looked like" one

16 | of the robbers did not render evidence insufficient); People v.

17 | Jackson, 183 Cal. App. 2d at 568 ("The uncertainty of recollection,

18 | qualification of identity and lack of positiveness in the testimony of

19 | the several witnesses complained of by appellant were matters going to

20 | the weight of the evidence and the credibility of witnesses

21 | [citations], and for the observation and consideration, and directed

22 | solely to the attention of, the jury in the first instance . . . .").

23 | A jury's credibility determinations are "entitled to near-total

24 | deference under Jackson [v. Virginia]." Bruce v. Terhune, 376 F.

25 | 950, 957-58 (9th Cir. 2004) (citations omitted) (evidence sufficient

26 | to show petitioner molested his 10-year-old cousin; federal habeas

27 | court could not revisit jury's resolution of inconsistencies between

28 | victim's account and those of other witnesses, and victim's account

1  was not "wholly incredible"); see also United States v. Franklin, 321

2  F.3d 1231, 1239-40 (9th Cir.), cert. denied, 540 U.S. 858 (2003) (in

3  reviewing the sufficiency of the evidence, a court does not "question

4  a jury's assessment of witnesses' credibility" but rather presumes

5  that the jury resolved conflicting inferences in favor of the

6  prosecution). The issue whether witnesses lied or erred in their

7  perceptions or recollections is properly left to the jury.  United

8  States v. Zuno-Arce, 44 F.3d 1420, 1233-34 (9th Cir.), cert. denied,

9  516 U.S. 945 (1995).

10

11      Upon this Court's review of the entire record,[16] the Court

12  concludes that the evidence was constitutionally sufficient.

13  Therefore, Petitioner is not entitled to habeas relief on his

14  challenge to the sufficiency of the evidence.

15

16                          **RECOMMENDATION**

17

18      For the foregoing reasons, IT IS RECOMMENDED that the Court issue

19  an Order: (1) approving and adopting this Report and Recommendation;

20  and (2) directing that Judgment be entered conditionally granting

21  habeas relief.

22

23      DATED:  November 12, 2008.

24  _____/S/_____
                    CHARLES F. EICK
25              UNITED STATES MAGISTRATE JUDGE

26

27      [16]    The Court must conduct an independent review of the
    record when a habeas petitioner challenges the sufficiency of the
28  evidence.  See Jones v. Wood, 114 F.3d at 1008.

1  **NOTICE**

2      Reports and Recommendations are not appealable to the Court of

3  Appeals, but may be subject to the right of any party to file

4  objections as provided in the Local Rules Governing the Duties of

5  Magistrate Judges and review by the District Judge whose initials

6  appear in the docket number.  No notice of appeal pursuant to the

7  Federal Rules of Appellate Procedure should be filed until entry of

8  the judgment of the District Court.